[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14324
_____

D.C. Docket No. 1:14-cv-22479-MGC


RAMON GONZALEZ,

Plaintiff-Appellant,

versus

STATE OF FLORIDA DEPARTMENT OF MANAGEMENT SERVICES,
MANUEL R. MORALES, JR.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 23, 2017)

Before ED CARNES, Chief Judge, FAY and PARKER,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

In November 2010 Ramon Gonzalez, who is Cuban, began working as maintenance supervisor for Florida's Department of Management Services in its Division of Real Estate Development and Maintenance.[1]  Facilities Manager Norberto Fernandez ("N. Fernandez") hired him.  The two of them together were responsible for developing work plans for the mechanical staff, reviewing maintenance work performed at three buildings, and contracting with outside vendors for work order supplies and services.  And in his position as maintenance supervisor, Gonzalez was also responsible for managing seven employees who worked as maintenance mechanics and support technicians in the three buildings, prioritizing work orders, and conducting daily inspections of operations systems.

Viewing the evidence in the light most favorable to Gonzalez, nine months after N. Fernandez hired Gonzalez, Deputy Bureau Chief of Regional Facilities Daniel Eberhart told N. Fernandez that he would not have hired Gonzalez because he "spoke with a heavy Cuban accent" and he "spoke too loud."  According to N. Fernandez's declaration,"there were several occasions where Mr. Eberhart made comments about Ramon Gonzalez's accent in a way that made it clear that he wanted to get rid of him."  Neither N. Fernandez's declaration nor any other part of the record provides any information about when those comments were made or

---

[1] "At summary judgment we view the facts in the light most favorable to the nonmoving party," taking those facts from the "evidentiary materials on file."  Crawford v. Carroll, 529 F.3d 961, 964 n.1 (11th Cir. 2008).

2

specifically what was said by Eberhart that "made it clear" he wanted to "get rid of" Gonzalez.

In January 2013 Eberhart issued a memo to N. Fernandez expressing concerns about his work performance and directing him to take immediate action to correct the problems. The memo listed three areas in need of improvement — communication, personnel management, and maintenance management — and provided details of the specific problems within each category. After deciding that N. Fernandez had not sufficiently improved by April of that year, Tom Berger, Director of the Division of Real Estate and Maintenance, recommended that human resources fire him based on his poor supervisory performance, hostile demeanor, and insubordination. N. Fernandez was fired soon thereafter and, so far as the record shows, he never filed any action contesting his firing.

After N. Fernandez was fired, Eberhart assigned joint responsibility of the three buildings to Gonzalez and Lissette Fernandez ("L. Fernandez"), with Gonzalez supervising all of the maintenance tasks. Eberhart directed them to send all work requests to him for final approval because he wanted control over the maintenance work for budgetary reasons. In violation of that directive, Gonzalez authorized the repair of a fence before Eberhart had given that repair work final approval, which caused the work to be performed without the Department having in place any way to pay for those repairs. Gonzalez also authorized payment for

3

the repair of a light pole that should not have been paid for because the work was unacceptable.

Senior mechanic Joel Kyllonen and facilities manager Ralph Reynolds emailed Eberhart in late April 2013 after visiting Gonzalez at one of the buildings he was managing. Both Kyllonen and Reynolds described Gonzalez as having been angry, argumentative, and loud while they were with him. Reynolds reported that he had told Gonzalez that "his attitude was not a positive representative [sic] of [the Department] and shouldn't occur again." Around that time, Eberhart had a conference call with his supervisor, a human resources representative, and Eberhart's assistant, whose handwritten notes show that the discussion topics included Gonzalez's "poor attitude" and difficulties communicating with others, and also state that "[s]ince [N. Fernandez]'s exit we have discovered more details about [Gonzalez]'s performance." They discovered "deficiencies" in Gonzalez's performance that N. Fernandez "did not address" while he was Gonzalez's supervisor. During that conference call, Eberhart also mentioned receiving complaints from employees who directly reported to Gonzalez. According to Eberhart, those employees said that Gonzalez berated and belittled them in front of building tenants, vendors, and members of the public. Those were not the only complaints about Gonzalez. L. Fernandez testified that she had received complaints from employees, tenants, and vendors about his loud, aggressive, and

4

intimidating manner of communication, and that he had a bad attitude and complained about having to make necessary repairs. Evidence showed that Eberhart knew about at least one of the tenant's complaints.

Gonzalez himself testified that he is a "strong, hard-voiced talking person" and knows that he talks "loud." He also conceded that he tends to talk louder and faster when he is upset and that those around him could misinterpret him as yelling.

In a May 30, 2013 memo to the director of human resources, Division Director Berger recommended that Gonzalez be terminated. Berger's memo stated that Eberhart had visited one of the three buildings and had determined that Gonzalez lacked organization in carrying out his supervisory duties. The memo explained that there was no routine maintenance program and that employees had complained that Gonzalez yelled at them, berated them, and called them names. It also mentioned Gonzalez's failure to follow proper purchasing and payment protocols, and it concluded by recommending that he be terminated "for poor performance, insubordination/failure to follow instructions and conduct unbecoming." The information upon which Berger relied to write that memo came from human resources, which had in turn received the information from Eberhart.

After receiving Berger's memo, the director of human resources decided that dismissal was warranted, and in a letter dated June 4, 2013, he notified Gonzalez

5

that "[w]e have determined that it is in the best interest of the Department that your employment be terminated . . . ."  The letter offered no further explanation for the termination.  Because he was in a supervisory position, Gonzalez was a "select exempt service employee," which is an "at will" employee who can be terminated at any time without cause.  For those select exempt service employees, the Department "may use disciplinary actions at [its] discretion."

## I.

After obtaining a right-to-sue letter from the EEOC, Gonzalez filed a lawsuit in Florida state court alleging national origin discrimination in violation of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10, and Title VII of the Federal Civil Rights Act, 42 U.S.C. § 2000e-2.  The Department removed the case to federal district court and, after discovery, filed a motion for summary judgment.  Gonzalez filed a response in opposition to that motion, attaching as support N. Fernandez's declaration as well as his own.  The Department then filed a motion to strike N. Fernandez's declaration because it violated Federal Rule of Civil Procedure 26 and to strike one paragraph of Gonzalez's declaration as inadmissible hearsay.  The district court, in its summary judgment order, granted both parts of the Department's motion to strike and its motion for summary judgment.  This is Gonzalez's appeal.

II.

Gonzalez contends that the district court abused its discretion by granting the Department's motion to strike. We need not resolve that question because, as we will explain, even considering both declarations in their entirety, Gonzalez has offered no direct evidence of discrimination and has failed to offer evidence raising a genuine issue of fact as to pretext.

III.

In relevant part, Title VII makes it unlawful to fire or take any other adverse employment action against an employee based on that employee's national origin. See 42 U.S.C. § 2000e–2(a)(1).[2] A plaintiff bringing a Title VII claim can prove intentional discrimination through direct or circumstantial evidence. See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). Gonzalez contends that he should not suffer summary judgment because he has presented direct evidence of discrimination and, alternatively, he has presented circumstantial evidence sufficient to both make out a prima facie case and show pretext under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981).

---

[2] Doing so is also unlawful under the Florida Civil Rights Act. Fla. Stat. § 760.10(1)(a). Florida courts have held, and the parties do not dispute, that "decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). As a result, analysis of the state claim is subsumed in analysis of the federal claim.

Gonzalez contends that Eberhart's comments about his accent and loud manner of talking are direct evidence of discrimination. Because Eberhart did not make the final decision to fire Gonzalez, the first step is usually to determine whether Eberhart's statements about Gonzalez's accent and loud volume can be imputed to Berger under a "cat's paw" theory of liability. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) ("This [cat's paw] theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation [of a non-decisionmaker] without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."). Because it does not matter to the result, however, we will simply assume for purposes of this appeal that Eberhart's comments about Gonzalez's accent and loud voice can be imputed to Berger under the "cat's paw" theory of liability.

We also conclude that Eberhart's comments about Gonzalez's accent and loud manner of speaking are not direct evidence of national origin discrimination. "Direct evidence is evidence which, if believed, proves the existence of a fact without inference or presumption." Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227 (11th Cir. 2002). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible

8

factor constitute direct evidence of discrimination.  If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotation marks omitted).

As support for his contention that Eberhart's comments about his accent and loud voice are direct evidence of discriminatory motive, Gonzalez cites Akouri v. State of Florida Department of Transportation, 408 F.3d 1338 (11th Cir. 2005). In the Akouri decision, the plaintiff, who was born in Lebanon, testified that he had been denied a promotion and that when he asked "shortly after" that denial why another employee had been chosen instead, he was told:  "[T]he people working in the crew are not the same that are working in the office.  There [are] no black or Hispanic [employees] in the back. . . . [T]hey are all white and they are not going to take orders from you, especially if you have an accent, and something like that." Id. at 1341, 1347–48 (quotation marks omitted) (third alteration in original).  We concluded in the Akouri decision that the explanation for why the plaintiff had been denied the promotion was direct evidence because "[t]here is no mere suggestion or need for inferences because the statement relates directly to the [employer]'s decision to promote [someone else] over Akouri . . . and blatantly states that the reason he was passed over for the promotion was his ethnicity." Id. at 1348.

9

Unlike the direct evidence in the <u>Akouri</u> case, Eberhart's statements were not directly related to Gonzalez's termination (or Eberhart's decision to report to Berger about the problems with Gonzalez's job performance).  The only evidence of <u>when</u> Eberhart commented about Gonzalez's accent and loud voice is the statement Eberhart made to N. Fernandez two years before Gonzalez's termination.  <u>See</u> <u>Scott</u>, 295 F.3d at 1227–28 (noting that the comment "[w]e'll burn his black ass" was not direct evidence of discrimination because "it was made approximately two and one-half years before the [plaintiff was terminated] and because it was not directly related to the subject of [the plaintiff]'s termination").  As a result, Eberhart's comments are not direct evidence of discrimination.

## IV.

Lacking any direct evidence of discrimination, Gonzalez could still have escaped summary judgment by offering sufficient circumstantial evidence to meet the burden-shifting framework under the <u>McDonnell Douglas</u> and <u>Burdine</u> decisions.  Under that framework the plaintiff bears the initial burden of showing a prima facie case of discrimination.  <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802, 93 S. Ct. at 1824.  If the plaintiff makes that showing, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."  <u>Id.</u>  "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the

10

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.

While the parties dispute whether Gonzalez has made out a prima facie case of discrimination, we need not decide that issue because, as we will discuss, Gonzalez has failed to raise a genuine issue of material fact as to whether the Department's proffered reasons for firing him were a pretext for discrimination. See Alvarez, 610 F.3d at 1265 ("It matters not whether Alvarez has made out a prima facie case if she cannot create a genuine issue of material fact as to whether [the defendant]'s proffered reasons for firing her are pretext masking discrimination.").

The Department provided several legitimate nondiscriminatory reasons for firing Gonzalez, all of which are summarized in Berger's memo recommending that he be terminated:  He did not carry out his maintenance supervisory duties in an organized way; there was no routine preventative maintenance program; employees, including Kyllonen and Reynolds, had complained that Gonzalez had yelled at them, berated them, or called them names; at least one tenant had complained to Eberhart that Gonzalez had yelled at her and made her uncomfortable; and Gonzalez had failed to follow proper purchasing and payment protocols.

11

Because the Department articulated several legitimate nondiscriminatory reasons for terminating Gonzalez, he had the burden of putting forward evidence raising a genuine issue of material fact as to whether those reasons were pretextual. See Alvarez, 610 F.3d at 1265.  Gonzalez could have done so "either by offering evidence that [the Department] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible."  Id.  Because the Department provided multiple reasons for terminating Gonzalez, he had to "produce sufficient evidence for a reasonable factfinder to conclude that each of [those] proffered nondiscriminatory reasons is pretextual."  Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc) (emphasis added).

Gonzalez contends that he presented enough circumstantial evidence to create a genuine issue of material fact that each proffered reason was pretextual. But he didn't.  Gonzalez submitted a declaration asserting that his performance was satisfactory, that he had never been counseled or disciplined, and that "[i]f there were any truth to these matters [raised by the Department as supporting his termination], they would have been brought to my attention through the progressive discipline [policy]."  And N. Fernandez, who had himself been fired for other reasons, submitted a declaration stating that he had been satisfied with Gonzalez's performance and that in his opinion the Department should have addressed the alleged problems about Gonzalez's performance through "coaching

12

for improvement," and not termination.  However, as we have "repeatedly and emphatically held":

> employers may terminate an employee for a good or bad reason without violating federal law.  Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges.  We are not a super-personnel department assessing the prudence of routine employment decisions, no matter how medieval, high-handed, or mistaken.  Put frankly, employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015) (quotation marks and citations omitted).

While Gonzalez's declaration asserts that his performance was satisfactory, he has offered no evidence disputing the fact that:  (1) employees and at least one tenant had complained to Eberhart about Gonzalez's communication problems; (2) tenants and vendors had complained to L. Fernandez about his belligerent treatment of them; (3) he did not wait for a purchase order for a fence repair before having that work done, which caused the work to be completed before the Department had in place a method of payment; and (4) Gonzalez had authorized payment for the repair of a light pole that should not have been paid for because the work was unacceptable.[3]  In his deposition Gonzalez conceded that when he

---

[3] While his declaration states that the initial repair of the light pole was approved by Eberhart, Gonzalez does not dispute that the repair should not have been paid for because the

gets upset he speaks more rapidly and at a louder volume, and that his doing so could be interpreted by others as yelling. There was no evidence at all disputing the fact that he had yelled at employees and tenants of the Department.

The statement in N. Fernandez's declaration that he was satisfied with Gonzalez's performance does not establish pretext. N. Fernandez himself was fired because of his poor supervisory performance along with his hostile and insubordinate demeanor. "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002). Evidence that a supervisor — who was himself fired because of his hostile demeanor and poor performance — did not find an employee's demeanor and performance unsatisfactory, is not sufficient to create a genuine issue of material fact about whether non-terminated supervisors did. And there is also evidence showing that even more problems with Gonzalez's performance were discovered after N. Fernandez had been fired.

Gonzalez argues that the fact the Department gave him no formal warning or counseling is evidence of pretext. The Department's disciplinary policy does not mandate counseling or formal warning before termination but instead states that

work was unacceptable, and instead asserts only that "[t]he repair work on the light pole did not need to be redone to my knowledge" and speculates that "[i]f there were any truth to the claim that I did something wrong, it would have been brought to my attention through the progressive discipline [policy]." (Emphasis added).

the Department "may use disciplinary actions at their discretion concerning Select Exempt Service . . . employees," and that "[c]ounseling may be used to help employees recognize a mistake or deficiency. . . ." (Emphasis added). Because counseling and formal warnings were discretionary options, the Department's failure to provide them does not raise a genuine issue of fact as to whether its stated reasons for terminating Gonzalez were pretextual. See Alvarez, 610 F.3d at 1262 n.7, 1268 (concluding that the plaintiff had failed to raise a genuine issue of material fact even though the employer had admitted that it had not followed its progressive discipline policy, which normally provided for successive verbal and written warnings before an employee was terminated for misconduct); see also Morris v. City of Chillicothe, 512 F.3d 1013, 1020 (8th Cir. 2008) ("Deviance from a progressive discipline policy can be evidence of pretext, but here, the department's employee manual and related documents specifically state that the department is not bound by any number of warnings and that it can fire at-will employees without warning if necessary. We have found such caveats in an employee policy negate its persuasiveness in showing pretext.").

Gonzalez has failed to raise a genuine issue as to pretext. While he offered evidence showing that Eberhart made some remarks about his accent and loud manner of speaking at some point during his employment, including one comment that was made almost two years before his termination, that evidence standing

15

alone does not establish pretext.  See Scott, 295 F.3d at 1229 ("Although a comment unrelated to a termination decision may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext.") (citation omitted).  The district court did not err in granting summary judgment to the Department.

**AFFIRMED.**